Heather Marie HOBBS *v.* Tad Oliver HOBBS

CA 01-13                                          55 S.W.3d 331

Court of Appeals of Arkansas
Division IV
Opinion delivered October 3, 2001

*Ronald L. Griggs,* for appellant.

*Robert L. Depper, Jr.,* for appellee.

WENDELL L. GRIFFEN, Judge. This appeal concerns a divorce decree that granted joint custody of fifteen-month-old Jacob Hobbs, with alternating weeks of physical custody, to his parents, appellant Heather Marie Hobbs and appellee Tad Oliver Hobbs. Appellant contends that joint custody was not warranted based on the evidence presented at trial. We agree that the record demonstrates that at the time of the final hearing the parties were not working in concert to reach shared decisions

regarding the child. Accordingly, we reverse and remand this case to the chancellor for further action consistent with this opinion.

The parties separated after approximately one year of matrimony and two months following Jacob's birth.[1] Appellee filed a petition for legal separation, and appellant counterclaimed for divorce. In her counterclaim, appellant requested full custody of Jacob.

At a temporary hearing, the chancellor ordered joint custody with the parties alternating physical custody of the child weekly. The chancellor also ordered the parties to exchange Jacob on Mondays at a business parking lot in Magnolia.[2] She directed the parties to cooperate concerning Jacob's care and well being and to provide each other with a list of foods, types of diapers used, medicines, and any other information needed to ensure his proper care. This arrangement continued from the date of the temporary hearing until the final hearing. The chancellor also ordered the parties to enter into individual and joint counseling to help them get along and focus on the best interest of their child. Because the parties could not agree on a counselor, the court ordered the parties to seek consultation with Dr. Mike Fitts.

A final hearing occurred on August 16, 2000. During the hearing, appellant testified that she was twenty-two years of age, lived in Magnolia with her parents, and that she currently worked and attended school. She complained that appellee did not participate in the exchange of the child. As a result, appellant testified that she was forced to interact with her mother-in-law, with whom she has an acrimonious relationship.

Although the court ordered the parties to communicate on a weekly basis, appellant testified that she had to give written correspondence to appellee's mother, who would read the correspondence and react negatively if she did not agree. Appellant also testified that she had tried, to no avail, to get appellee to participate in the exchange, but that when she tried to call him, he told her never to call him again and to speak with his lawyer. She acknowledged that she attended two individual sessions after the court ordered counseling, but admitted that she did not attend joint

---

[1] The parties were married on June 12, 1998, and separated on July 29, 1999. Jacob was born May 18, 1999.

[2] At the time of the temporary and final hearings, the parties lived approximately thirty-five miles apart, with appellant living in Magnolia and appellee living in El Dorado.

counseling sessions as ordered. Appellant contended that the joint custody arrangement was not working toward Jacob's best interest because appellee did not correspond with her weekly and did not participate in the exchange.

The chancellor also heard testimony from Jacob's pediatrician, Dr. Amy Albin, who confirmed that Jacob suffered from eczema, an allergic skin disorder, and that due to Jacob's sensitive skin, he was more prone to diaper rash. However, Dr. Albin testified that she saw nothing that indicated Jacob was not properly cared for, and that overall, Jacob was a healthy child.

Appellant's sister, Brandi Young, echoed the sentiments of appellant that there were problems in the exchange. Another witness, Ann Bridges, testified that appellant was an attentive parent. In addition, appellant's father, Dr. James Young, testified that appellee never participated in the custody exchange, but instead played softball.

Appellee testified that he was twenty-six years of age and lived in El Dorado with his parents. He admitted that he had not tried to communicate with appellant since the temporary hearing and further reported that appellant only telephoned him twice in over a one-year period. Appellee stated that when he and appellant went to the counseling session, he suggested to the counselor that they initially undergo individual counseling. The counselor met with the couple separately on two different occasions, but was unable to complete a joint counseling session because appellant did not show up. Appellee testified that he participated in two exchanges with appellant in the time period between the temporary hearing and the final hearing. He stated that he had no definite working hours, and that he was on call on alternate weeks. Appellee testified that he participated in a church softball league, and that his mother kept his son while he worked or played softball. He relayed that it was "too fast" for him and appellant to have any communication, and it was hard for him to stomach the exchanges.

Appellee's mother, Louise Hobbs, also testified at the hearing. She told the court that she and her husband exchanged Jacob with appellant because of appellee's work schedule. Louise Hobbs testified that the circumstances surrounding the joint custody could be better, that the custody was going as well as could be expected under the circumstances, and that joint custody would be a problem when Jacob reached school age. She also acknowledged that she and appellant had problems communicating.

Also testifying on behalf of appellee were Jana Kay Moore and Regina Winget, who testified that they had witnessed appellee playing with Jacob, and that Jacob appeared to be a healthy, happy child. Several letters from one of the parties to the other concerning Jacob's care were introduced into evidence, as well as photographs of him and two videotapes of the exchanges.

After the hearing, the chancellor entered an order that found that the child had been exchanged as directed but that communication between the two parties had been almost nonexistent. She further found that the parties harbored much bitterness toward each other. Yet the chancellor ordered the parties to share joint physical and legal custody of Jacob, to exchange him weekly, and to speak directly with each other on the day prior to the exchange to discuss Jacob and any special concerns they had about him. The chancellor also ordered appellee to personally exchange Jacob unless he was at work and for the parties to attempt to accommodate each other for any scheduling changes. This appeal follows.

### The Joint-Custody Decision was Clearly Erroneous

■ ■ Chancery cases are reviewed *de novo* on appeal. *See Thompson v. Thompson,* 63 Ark. App. 89, 974 S.W.2d 494 (1998). A chancellor's findings are not reversed unless this court determines that the findings are clearly erroneous. *See id.* Special deference is given to a chancellor's findings in child-custody cases because of the chancellor's superior position to determine witness credibility, testimony, and the best interest of the child. *See id.*

■ ■ Custody awards are not made to punish or reward either parent. *See Callaway v. Callaway,* 8 Ark. App. 129, 648 S.W.2d 520 (1983). Instead, the primary focus is on the best interest and welfare of the child. *See Thompson, supra.* Our laws do not favor joint custody, unless it is clear that the parties have demonstrated a mutual ability to cooperate in reaching shared decisions concerning the child's welfare. *See Thompson, supra.*

*Thompson, supra,* involved a joint-custody agreement concerning the parties' two-year-old child, which was approved by the court. The agreement provided that the parties alternate physical custody of the child on a week-to-week basis. After two months, Mrs. Thompson filed a petition to change custody, alleging that the agreement was unworkable. Upon finding that a material change in

circumstances had occurred, the chancellor awarded Mrs. Thompson custody of the child with liberal visitation to Mr. Thompson. Following *de novo* review, we affirmed the chancellor's finding, noting that the record demonstrated that the parties were unable to cooperate regarding their child's health care. *See Thompson, supra.* We stressed the importance of the record demonstrating that the parties were willing and able to cooperate in reaching shared decisions concerning the best interest of the child in order to justify an award of joint custody. *See Thompson, supra.*

In *Drewry v. Drewry*, 3 Ark. App. 97, 622 S.W.2d 206 (1981), we affirmed a chancellor's decision to grant joint custody. After observing that the evidence indicated that the parents shared equally in the child's care, that they lived in close proximity to each other, and that each parent was stable, we agreed that the record supported the chancellor's finding that it was in the child's best interest to have equal contact and shared care by his parents. *See Drewry, supra.*

Contrary to the harmonious atmosphere presented in *Drewry, supra,* and notwithstanding the standard prescribed in *Thompson, supra,* the record clearly shows that the parties in the instant case failed to demonstrate "mutual ability . . . to cooperate in reaching shared decisions in matters affecting [Jacob's] welfare." Instead, the record indicates that communication between the parties was virtually nonexistent as of the final hearing, and had been that way for over a year. This fact was established by both parties' testimonies and is mentioned in the chancellor's order. Significantly, when the chancellor ordered the parties to attend joint counseling sessions, the couple could not agree on a counselor. Consequently, the chancellor selected a counselor. However, the parties testified at the final hearing that they never attended joint counseling sessions, although these sessions were specifically designed to help the parties get along so they could focus on the best interest of their child. In fact, their interaction on Jacob's first birthday, which fell on appellee's scheduled week of custody, resulted in a physical altercation between appellant and appellee's mother that occurred in Jacob's presence and that frightened him and reduced him to tears.

Although appellee concedes that the parties have difficulty communicating with each other, he urges that we affirm the chancellor because the difficulty in communication can be ironed out with "a little maturity, a little time, and the direction of a court." However, our law is well settled that the primary consideration in child custody is the child's best interest *at the time of the final hearing* as demonstrated by the record. The time for parties to demonstrate

the mutual ability to cooperate in reaching shared decisions in matters affecting a child's welfare so as to justify an award of joint custody is before and at the hearing that is the basis of the joint-custody award, not some later time in an unknown future based on unproven facts. It is neither the responsibility nor the role of the court to accommodate the parties' growing pains at the expense of a child. Given the parties' demonstrated inability to communicate or cooperate in reaching shared decisions concerning Jacob's best interest at the time of the final hearing, the chancellor's finding that the circumstances warranted joint custody is clearly erroneous.

Accordingly, we reverse and remand for further action regarding custody based on Jacob's best interest, not the parties' future intentions. We do not prejudge the custody determination. Whether joint custody, custody to appellant, or custody to appellee is in Jacob's best interest must be determined by the chancellor in the light of evidence established by the record when the custody determination is made. The record before us shows that appellant, appellee, and appellee's mother have been engaged in a war of wills. A legitimate concern in view of this clear reality is whether the enmity the parties have manifested renders either of them unsuitable to be awarded custody. While we do not decide that question, we cannot ignore the evidence that Jacob's best interest has thus far been overshadowed by the previously mentioned acrimony of the adults responsible for his nurture and welfare. Neither should the chancellor ignore the evidence on remand.

Reversed and remanded.

NEAL, J., agrees.

STROUD, C.J., concurs.

JOHN F. STROUD, JR., Chief Judge, concurring. I concur. It is clear that at the time this divorce was granted and joint custody was awarded, these parties were not working in concert with each other to raise this child. The chancellor acknowledged in her letter opinion that "communication between the two parties has been almost nonexistent [and that] they each harbor much bitterness toward each other." Under those circumstances and under the considerations required of us by *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998), the chancellor erred in awarding joint custody. However, it has now been over a year since the divorce was granted and joint custody was awarded. Circumstances may well have changed, for the better or for the worse. I

write only to express my opinion that upon remand the chancellor will be free to re-examine the custody issue in light of the current situation between the parties. Depending upon those circumstances upon rehearing, the chancellor may award custody to the mother, to the father, or again to both if the chancellor determines that the parties are now communicating and can now work in concert to raise the child. Of course, the polestar of such a decision must still be the best interest of the child.